IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MONIQUE RICHARDS SMITH,
  *Plaintiff,*

  v.

ASTRAZENECA PHARMACEUTICALS
LP.,
  *Defendant.*

Case No. 23-cv-1879-ABA

## MEMORANDUM OPINION

Plaintiff Monique Richards Smith[1] has sued her former employer, Defendant AstraZeneca Pharmaceuticals, LP, asserting claims of discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"). AstraZeneca has filed a motion to dismiss for failure to comply with Court discovery orders, and a motion for summary judgment. For the reasons that follow, AstraZeneca's motion for summary judgment will be granted and AstraZeneca's motion to dismiss will be denied as moot.

## I.   BACKGROUND[2]

AstraZeneca focuses on the discovery, development, and commercialization of prescription medicines. ECF No. 57-1 at 10. It has a facility in Gaithersburg, Maryland. ECF No. 1 ¶¶ 4, 6; ECF No. 11 (Answer) ¶¶ 4, 6.

---

[1] Although Plaintiff's complaint spells her last name as "Richards-Smith," Plaintiff has since explained in her deposition that the correct and legal spelling of her last name is "Richards Smith" with no hyphen. ECF No. 57-3, Deposition of Monique Richards-Smith, Pharm.D. ("Richards Smith Dep."), 13:1–14:1. Therefore, the Court will refer to her without the hyphen.

[2] Upon consideration of a motion for summary judgment, the Court must consider the facts in the light most favorable to the nonmoving party, Ms. Richards Smith. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

On or around August 15, 2016, Ms. Richards Smith began working at AstraZeneca as a Manager of Labeling Strategy. ECF No. 1 ¶ 10; ECF No. 11 ¶ 10. Katheryn Bradley was Ms. Richards Smith's first supervisor at AstraZeneca until around May 2018. ECF No. 57-3, Richards Smith Dep. 129:19–130:11. In or around December 2016, Ms. Bradley rated Ms. Richards Smith a 2 out of 5 during her 2016 annual performance evaluation. *Id.* 144:2–7. She contends that Ms. Bradley informed her that this rating was due to her short tenure in the role. *Id.* 403:10–16. In or around March 2018, Ms. Bradley rated Ms. Richards Smith a 4 or 4.1 out of 5 for her 2017 annual performance evaluation, which resulted in Ms. Richards Smith receiving a bonus. *Id.* 409:21–22; ECF No. 11 ¶ 14.

On April 1, 2018, Ms. Bradley promoted Ms. Richards Smith to Associate Director of Global Labeling Strategy, increasing her annual salary. ECF No. 57-6. The job description for this role states,

> As the Associate Director you will lead the development of the labelling strategy, in line with the overall regulatory strategy for the product, by interpretation of regulations, guidance and competitor analyses, anticipating the wider impacts of the strategy and understanding the longterm consequences for the product and the wider AZ portfolio. You will be providing strategic labelling expertise to the GRST/GRET/PLT for assigned products regarding language, placement and regulatory content detail for CPI and MPI in line with company procedures, regional labelling regulations and guidances.
>
> You will also provide clarity regarding applicable labelling requirements and expectations in all complex situations to all relevant stakeholders at all levels, providing risk insight and proposing mitigations. You will lead[] the PLT in the preparation and maintenance of high quality Core Prescribing Information, EU Quality review of Documents (QRD), US Prescribing Information (PI), Instructions For Use (IFUs)

> through to Senior Leader approval with the aim of achieving advantageous labelling. You will justify and communicate the labelling rationale to Senior Leaders to enable effective decision making. You will lead the development of target labelling documents as appropriate.

ECF No. 57-7 at 4.

From late April or early May 2018 until late summer 2018, Ms. Richards Smith's supervisor was Jonathan Griffiths. ECF No. 57-3, Richards Smith Dep. 132:18–133:13. Around late July 2018, Jamie Fava became Ms. Richards Smith's supervisor. ECF No. 1 ¶ 16; ECF No. 11 ¶ 16. Around that same time, Ms. Richards Smith began suffering from depression for which she sought medical attention and was prescribed medication. ECF No. 57-3, Richards Smith Dep. 373:20–374:10, 393:3–19. She experienced symptoms of fatigue, low motivation, and difficulty sleeping and with activities of daily living. *Id*. 403:18–404:6. Around September 2018, Ms. Richards Smith informed Ms. Fava of her diagnosis and requested an accommodation based on her doctor's recommendation of being able to telework whenever needed. *Id*. 199:15–19, 228:11-229:15. Her telework request was partially approved with AstraZeneca approving Ms. Richards Smith to telework two days per week in addition to the two days normally allowed for employees. *Id*. 396:1–5, 396:12–397:6, 398:4–9.

In addition to her telework request, Ms. Richards Smith requested intermittent leave under the Family Medical Leave Act ("FMLA"), which was approved in October 2018 for a six-month period, after which it would be subject to reassessment. *Id*. 395:15–22. Ms. Richards Smith contends that Ms. Fava began questioning her for using intermittent leave rather than taking medical leave all at once. *Id*. 396:1–11. Ms. Fava also expressed concern that, on some days Ms. Richards Smith was teleworking, she was not available online at certain times during the day. *Id*. 398:11–18. Around September

and/or December 2018 (the timing is unclear), Ms. Richards Smith submitted a complaint to Kim Barrow, the Senior Employment Practices Manager in Human Resources at AstraZeneca, stating that she felt that Ms. Fava was discriminating against her. *Id*. 159:14–160:14, 179:2–14, 180:21–181:1. Ms. Barrow discussed the complaint with Ms. Fava and ultimately determined that the complaint was "unsubstantiated." *Id*. 181:2–19; ECF No. 64-2.

Around January 2019, Ms. Fava left AstraZeneca and Sara Ellmark, the Global Head of Labeling, became Ms. Richards Smith's supervisor. ECF No. 57-3, Richards Smith Dep. 133:18–134:4. Shortly thereafter, Ms. Richards Smith informed Ms. Ellmark that she was pregnant. *Id*. 400:14–20. They discussed Ms. Richards Smith getting about twenty-eight or thirty days of paid bonding leave in addition to short-term disability leave after the birth of her child. *Id*. 401:3–401:17. In or around March 2019, Ms. Ellmark gave Ms. Richards Smith a 2 out of 5 on her 2018 annual performance evaluation, which resulted in a reduced bonus award. *Id*. 150:14–16, 199:22–200:3; ECF No. 57-8.

Ms. Richards Smith's 2018 performance evaluation included comments from Ms. Bradley, Mr. Griffiths, and Ms. Fava. ECF No. 57-8 at 2–3. Several were complimentary but several expressed concerns about Ms. Richards Smith's performance. Some of Ms. Bradley's comments include:

- "At the manager level Monique delivered a major NDA submission and SNDA submissions with generally good quality under expedited timeframes." *Id*. at 2.
- "She needs to continue to work on her 'Soft skills' and attention to detail." *Id*.
- "The handover between Monique and her successor on the Lynparza project was not as smooth as it could have been. . . . we had to ask for the history logs to be completed several times. I realize that Monique was

trying to learn a new project as well but I would have expected a smoother transition to a labelling manager that was new to the role." *Id.*

- "The current labelling lead discovered that Monique finalized a labelling supplement of revised contraception without including an annotation to the supporting report." *Id.*

Some of Mr. Griffiths's comments include:

- "During her time she organised one major CRM meeting which I understand from multiple members present did not go well." *Id.*
- "Unfortunately, despite three separate meetings on this topic at no point did I observe Monique reflect on how she may have contributed to the situation, rather she kept reiterating that she was proud of her work on roxa and her answers were always that the ball was in the other court." *Id.*

Some of Ms. Fava's comments include:

- "The team has received very positive feedback on the effectiveness of the Town Halls and Monique herself received very positive feedback for her work." *Id.* at 3.
- "The following improvement areas were noted: Communications within GLG. At multiple times GLG team members did not receive responses to questions posed to Monique, making it sometimes challenging to progress work. . . . [and] attention to detail and document quality." *Id.*
- "Monique developed a draft output which did not adequately reflect the product and sent it out for team review, late in the review timeframe." *Id.*
- "Monique has shown she has the capabilities to deliver GLG work, but will need to renew her focus on document quality and improving communication skills to work effectively and independently at the Associate Director level." *Id.*

On March 14, 2019, Ms. Richards Smith sent an email to Ms. Barrows and Michelle Monti, a member of the Human Resources team at AstraZeneca, appealing her 2018 performance evaluation stating that she believed that she had been unfairly penalized for performance issues related to her disability. ECF No. 57-13 at 2–3. On May 2, 2019, Ms. Barrows emailed Ms. Richards Smith stating that she had investigated her claim of discrimination and found it to be unsubstantiated. ECF No. 57-3, Richards Smith Dep. 234:4–22.

On May 30, 2019, Ms. Ellmark placed Ms. Richards Smith on a Performance Improvement Plan ("PIP"). ECF No. 57-9. In the plan, Ms. Ellmark stated that Ms. Richards Smith had "45 days from the date of this document to show significant and sustained improvement in [her] performance. If [she] fail[ed] to meet the expectations of this PIP, [she would] be subject to discipline up to and including immediate termination of [her] employment." *Id.* at 2. The PIP listed five primary areas of concern: "project deliverables not delivered to time and quality," "communication with colleagues and managers not adequate," "lack of proactivity and independence in project work," "recording of conversation without consent from all parties," and "listening in to sensitive discussions uninvited." *Id.* 3–4. Ms. Ellmark noted specific instances supporting each area of concern and noted that recording conversations without the consent of all parties violates AstraZeneca's Standards of Conduct Policy. *Id.* Finally, the PIP provided specific goals in a table with a column for "action," "expected outcome," and "how (this is not an exhaustive list but rather some ideas for approach)." *Id.* at 5. On May 31, 2019, Ms. Richards Smith sent Ms. Barrow and Ms. Ellmark an email expressing her disagreement with the characterization of her performance in the PIP. ECF No. 64-4 at 2.

In or around June 2019, Ms. Richards Smith requested short-term disability leave based on an increase in her depression-related symptoms, which she attributed to stress at work and her pregnancy. ECF No. 57-3, Richards Smith Dep. 405:10–406:3. She experienced complications during her high-risk pregnancy, including significant weight loss, severe nausea/vomiting that damaged her esophageal tract, and more. *Id.* 378:2–379:22. She began her short-term disability leave after submitting the request while it was under review. *Id.* 330:10–14. The request for short-term disability leave was

denied and, therefore, was unpaid from June 2019 until shortly after the delivery of her daughter. *Id*. 274:3–9, 406:4–8. On August 11, 2019, she underwent an emergency C-section to give birth to her daughter. *Id*. 372:17–18, 378:7–13. Ms. Richards Smith was then denied paid parental bonding leave without explanation. *Id*. 272:21–273:1, 401:7–402:3.

On or around December 23, 2019, Ms. Richards Smith returned to work. ECF No. 1 ¶ 56, ECF No. 11 ¶ 56; ECF No. 57-4, Declaration of Sara Ellmark ("Ellmark Decl.") ¶ 16. Her PIP had been suspended during her leave of absence and was reinstated on January 14, 2020. ECF No. 57-4, Ellmark Decl. ¶ 16; ECF No. 57-10 at 3–11. Much of the reinstated PIP replicated the May 2019 one, including the 45-day deadline for Ms. Richards Smith to improve her performance; however, the last two areas of concern from the May 2019 PIP were combined under one header of "lack of compliance with AZ values, policies and behaviors." ECF No. 57-10 at 3–11. In addition to the "recording of conversation without consent from all parties" and "listening in to sensitive discussions uninvited" areas of concern mentioned in the prior PIP, an additional area of concern was added in the reinstated PIP for "personal use of company credit card," which was alleged to have occurred in October and November 2019 after the initial PIP. *Id*.

In a meeting on January 14, 2020 regarding the reinstatement of the PIP, Ms. Ellmark informed Ms. Richards Smith of an option to exit AstraZeneca with severance in lieu of continuing the reinstated PIP, noting that the decision was entirely up to her. ECF No. 1 ¶ 57; ECF No. 57-4, Ellmark Decl. ¶ 18. Ms. Richards Smith decided to continue her employment at AstraZeneca. ECF No. 57-4, Ellmark Decl. ¶ 18. After the meeting, Ms. Richards Smith sent an email to Ms. Ellmark and Ms. Barrow stating,

> Thank you for taking the time to share this improvement plan with me because I can see that you only want me to be

7

successful as I continue my career at AstraZeneca. Your decision to spend regular 1:1 time with me weekly and giving me the opportunity to receive regular feedback from you about my performance is a gift. Thank you for making this sacrifice (of time) for me.

ECF No. 57-11.

During the time Ms. Richards Smith was on the PIP, she took intermittent leave and sick days. ECF No. 57-4, Ellmark Decl. ¶ 31. Ms. Ellmark did not expect Ms. Richards Smith to respond to emails on days she was not working, but Ms. Ellmark states she did expect Ms. Richards Smith to respond to those emails once she was working and to respond to new emails received on her workdays. *Id.* Ms. Ellmark, however, contends that Ms. Richards Smith did not respond to a number of emails while she was working and did not perform various tasks outlined in the PIP. *Id.* ¶ 32. On March 11, 2020, fifty-seven days after the PIP was reinstated, Ms. Ellmark provided Ms. Richards Smith with an updated version of the PIP that included, under the "Expected Outcome" column, cells for each "Action" captioned "Assessment against expected outcome" in which she listed how Ms. Richards Smith had performed as to each plan goal. ECF No. 57-10 at 6–11. The updated document noted Ms. Richards Smith's failure to fully meet assignment requirements, *id.* at 7, failure to provide weekly plans, *id.*, failure to provide a summary or updates of work completed, *id.* at 9, 10, frequently appearing as offline on Skype or having most of her calendar blocked off despite only being assigned one project, *id.* at 9–10, incorrect information included in assignments, *id.* at 11, and various other deficiencies. Accordingly, AstraZeneca terminated Ms. Richards Smith's employment on March 11, 2020. *Id.* at 2, 12; ECF No. 57-3, Richards Smith Dep. 337:18–19.

On June 24, 2020, Ms. Richards Smith filed a Charge of Discrimination with the Montgomery County Office of Human Rights and the Equal Employment Opportunity Commission ("EEOC") alleging that AstraZeneca unlawfully harassed, discriminated, and retaliated against her because of her disability. ECF No. 1 ¶ 8. Ms. Richards Smith received a Notice of Right to Sue from the EEOC on April 14, 2023 and filed this case on July 12, 2023. ECF No. 1 ¶ 9. In her complaint, Ms. Richards Smith alleges two claims under the ADA: discrimination and retaliation. *Id.* ¶¶ 65–92. For her discrimination claim, Ms. Richards Smith alleged that her supervisor Ms. Fava harassed her for taking leave despite the accommodation having been approved, and unfairly rated her in her 2018 performance evaluation. *Id.* ¶¶ 72, 76. For her retaliation claim, Ms. Richards Smith alleges that the relevant protected activity was in March 2019 "when she informed Ms. Barrow that she believed that management had targeted her for disparate treatment." *Id.* ¶ 85. Although not specifically stated as alleged adverse employment actions, she notes that she was placed on a PIP in May 2019, that her PIP was reinstated in January 2020, and that she was terminated in March 2020. *Id.* ¶¶ 86–88. She states that "[t]he proximity of Ms. Richards[ ]Smith's protected activities and her termination by the Defendant[] shows that a causal connection can be established to prove retaliation." *Id.* ¶ 89.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party meets its burden when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and when the nonmovant bears "the burden of proof at trial." *Celotex Corp. v. Catrett*, 477

9

U.S. 317, 322 (1986). If the non-moving party fails to confront the motion with "sufficient evidence . . . for a jury to return a verdict for that party," the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Matsushita*, 475 U.S. at 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). In making this determination, the Court views all facts, and all reasonable inferences drawn from those facts, in the light most favorable to the nonmoving party (here, Ms. Richards Smith). *Matsushita*, 475 U.S. at 587–88.

## III.   DISCUSSION

### A.   Statute of Limitations

To pursue an ADA claim in federal court, a plaintiff must first exhaust her administrative remedies by filing a charge with the EEOC. *Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012) (citing 42 U.S.C. § 12117(a) (incorporating the Title VII enforcement procedures); 42 U.S.C. § 2000e-5 (Title VII enforcement procedures)). In states that have an agency or entity with authority to grant and seek relief for unlawful employment practices (sometimes referred to as "deferral states"), if the aggrieved person institutes a proceeding before that state or local agency, they have up to 300 days "after the alleged unlawful employment practice occurred" to file a charge with the EEOC, rather than the standard 180 days. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109–10 (2002). In determining what constitutes "an unlawful employment practice" to start the clock on when an EEOC charge must be filed, the Supreme Court has interpreted "the term 'practice' to apply to

a discrete act or single 'occurrence,' even when it has a connection to other acts." *Morgan*, 536 U.S. at 111–12 (citing *Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 234–35 (1976); *Bazemore v. Friday*, 478 U.S. 385, 395 (1986)). "[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id.* at 112 (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977)).

Because Ms. Richards Smith filed a charge with the local agency (the Montgomery County Office of Human Rights) at the same time as with the EEOC, only acts that occurred within 300 days prior to the filing of that charge are considered timely. 300 days prior to June 24, 2020, when Ms. Richards Smith states that she filed her EEOC charge, is August 29, 2019.

AstraZeneca argues that Ms. Richards Smith's discrimination claim is based solely on acts alleged to have been done by a supervisor in 2018 and her 2018 performance evaluation, which she received on March 13, 2019, and therefore, her discrimination claim is untimely. ECF No. 57-1 at 21. AstraZeneca further argues that at least part of Ms. Richards Smith's retaliation claim is untimely as Ms. Richards Smith was placed on the PIP in May 2019 and the reinstatement of the PIP was merely a continuation of the original PIP (as to which any claims would be time-barred). *Id.* at 22. Ms. Richards Smith does not dispute that these actions occurred before August 29, 2019 but argues that "Plaintiff's claims based on termination are timely so long as the charge is filed within 300 days of that termination." ECF No. 64 at 15. Ms. Richards Smith argues that her "termination is the adverse action that triggered her retaliation and discrimination claims." *Id.*

As for Ms. Richards Smith's discrimination claim, despite the statement in her opposition brief to the motion for summary judgment, the complaint only alleges

discrimination based on Ms. Fava's actions in 2018 and the 2018 performance evaluation, both of which undisputedly occurred before the statutory time period. *See* ECF No. 1 ¶¶ 72, 76. Nothing in the discrimination claim alleged in the complaint identifies any act of discrimination related to Ms. Richards Smith's termination. *Id*. ¶¶ 65–79. Plaintiff cannot amend her complaint through her opposition brief to the motion for summary judgment to include her termination to the discrimination claim and, therefore, the Court will not consider a claim that AstraZeneca's termination of Ms. Richards Smith constituted a discriminatory adverse employment action. *See Barclay White Skanska, Inc. v. Battelle Mem'l Inst.,* 262 F. App'x 556, 563 (4th Cir. 2008) (quoting *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004)) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Therefore, Defendant's motion for summary judgment as to the discrimination claim will be granted.

As for Ms. Richards Smith's retaliation claim, the complaint alleges three different adverse actions that she alleges constitutes retaliation: (1) being placed on the PIP in May 2019, (2) the PIP being reinstated in January 2020, and (3) her termination in March 2020. ECF No. 1 ¶¶ 86–88. Ms. Richards Smith does not dispute the fact that the placement of the PIP was prior to the statutory time period or AstraZeneca's argument that the reinstated PIP was a continuation of the prior placement and therefore relates back to the May 2019 date—instead arguing only that the termination was timely. ECF No. 64 at 14–15. Therefore, to the extent that Plaintiff's retaliation

claim relates to the PIP being the adverse action, Defendant's motion for summary judgment on that aspect of Plaintiff's retaliation claim is granted.[3]

### B.      Retaliation Claim as to Plaintiff's Termination

The ADA's retaliation provision provides, in relevant part, that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). At the summary judgment stage, "[t]o establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) [s]he engaged in protected conduct, (2) [s]he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) (citing *A Soc'y Without a Name v. Commonwealth of Va.*, 655 F.3d 342, 350 (4th Cir. 2011)); *see Thomas v. City of Annapolis, Md.*, 851 F. App'x 341, 349–50 (4th Cir. 2021) (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)). "If the plaintiff makes a prima facie case of retaliation, the burden shifts to the employer 'to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason.' The burden then shifts back to the plaintiff to demonstrate that the employer's purported non-retaliatory reasons were pretextual." *Thomas*, 851 F. App'x at 350 (quoting *Foster*, 787 F.3d at 250) (internal citations omitted).

A plaintiff may satisfy her burden of establishing a causal link for purposes of making out a prima facie case "by showing that (1) the employer either understood or

---

[3] Given that Plaintiff did not dispute the timeliness of the PIP acts for independent retaliation claims, the Court will assume, without deciding, that the reinstatement of the PIP constituted an independent adverse action although it is unlikely to meet the definition of an adverse action for a retaliation claim. *See Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (citing *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 68–70 (2006)).

should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Id.* (quoting *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 335–36 (4th Cir. 2018)) (internal quotations omitted). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 239 F.3d 1248, 1253 (10th Cir. 2001)).

Although temporal proximity is not a strict prerequisite for a plaintiff to prove a causal nexus between protected activity and alleged retaliation, the Supreme Court and the Fourth Circuit have consistently found that, where a plaintiff relies on temporal proximity alone, more than a four-month gap is generally insufficient to establish causality. *See id.* at 274 (holding that a twenty-month gap was insufficient); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (holding that a three- to four-month gap was insufficient). Where the gap in time is between two and four months, courts have differed on whether the temporal proximity was sufficient to establish causality based on the context of the situation. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (holding that a four-month gap was sufficient); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (holding that a two-and-a-half-month gap significantly weakened the inference of causation, but the specific facts did not undercut the inference of causation enough to render the prima facie claim unsuccessful); *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (holding that a two-month gap was insufficient to infer causality based on the fact that the plaintiff had

14

been told that her performance was sub-par prior to the protected activity); *Johnson v. United Parcel Serv., Inc.*, Case No. 14-cv-4003-RDB, 2016 WL 4240072, at *7 (D. Md. Aug. 11, 2016), *aff'd*, 681 F. App'x 177 (4th Cir. 2017) (holding that a two-month gap prior to the first alleged adverse employment action and a five-month gap prior to the other alleged adverse employment actions were insufficient to infer causality).

Although the only protected activity that Plaintiff alleged in the complaint was her March 2019 complaint, *see* ECF No. 1 ¶ 85, in her opposition brief, Ms. Richards Smith argues that she also engaged in two other protected activities: taking FMLA leave and requesting newborn bonding leave, *see* ECF No. 64 at 19. Defendant argues that Ms. Richards Smith is attempting to amend her complaint through her opposition brief, as she did not allege these as protected activities in the complaint. ECF No. 66 at 10. Although the Statement of Claims section of Ms. Richards Smith's complaint only mentions one protected activity, the Court will assume (without deciding) that Plaintiff may rely on these additional alleged protected activities given that she referred to them in the Facts section of the complaint, because even considering them, Ms. Richards Smith's claim nevertheless fails.

Ms. Richards Smith first requested FMLA leave in December 2018–fifteen months before her termination. ECF No. 1 ¶ 22. She made her first discrimination complaint to Ms. Barrow later that same month. *Id.* ¶ 26. She emailed Ms. Barrow that she believed her 2018 performance evaluation was based on discrimination in March 2019—twelve months before her termination. *Id.* ¶ 85. She requested short-term disability leave again in June 2019—nine months before her termination. *Id.* ¶ 47. Finally, her requests for newborn bonding leave are alleged to have been submitted between August and September 2019—six months before her termination. *Id.* ¶¶ 50–51.

Ms. Richards Smith has not pointed to any case in which a six- to fifteen-month gap between protected activity and an adverse action, without more, was sufficient to imply causality. In fact, as discussed above, the case law counsels that a gap of four months or more is generally insufficient temporal proximity to establish causation. Given that temporal proximity is the only basis for which Ms. Richards Smith alleges that a causal connection is established, *see id.* ¶ 89, Ms. Richards Smith has not met her burden of establishing a prima facie case for retaliation. Therefore, Defendant's motion for summary judgment as to the retaliation claim will be granted.[4]

## IV.    CONCLUSION

For the aforementioned reasons, Defendant's motion for summary judgment will be granted, Defendant's motion to dismiss will be denied as moot, and Plaintiff's motion to strike will be denied as moot. A separate order follows.

Date: March 17, 2026                                             _____/s/_____
                                                                Adam B. Abelson
                                                                United States District Judge

---

[4] As the motion for summary judgment will be granted on the merits, the Court need not consider Defendant's arguments regarding any alleged discovery violations by Plaintiff. Defendant's motion to dismiss (as well as Plaintiff's motion to strike Defendant's letter that Plaintiff asserts was essentially a sur-reply to that motion) will be denied as moot.